IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
UNITED STATES OF AMERICA      :
                              :    CRIMINAL ACTION
          v.                  :    NO. 1:12-CR-378-JEC-ECS
                              :
EDWARDO ALFREDO SOTO-GARCIA   :
```

**REPORT AND RECOMMENDATION**

**I.
Introduction**

This matter is before the Court on Defendant's motion for a Jackson v. Denno[1] hearing and motion to suppress. [Doc. 13, 14]. The motions came on for evidentiary hearing on June 11, 2013, and a transcript was filed June 28, 2013. [Doc. 35]. The parties were requested to brief the motions. Defendant filed his brief on July 10, 2013, [Doc. 36], and the government responded on July 24, 2013. [Doc. 37]. Defendant filed no reply within the time permitted for a reply and the matter has now been submitted to the undersigned for a report and recommendation to the district judge.

**II.
Issues and Contentions**

Defendant moves to suppress all statements made by him after he was arrested on a Cobb County arrest warrant on August 28, 2012. Defendant contends that he was interrogated even after he had been

---

[1] 378 U.S. 368, 376-77(1964).

given Miranda[2] warnings and had invoked his right under Miranda to remain silent. Defendant also seeks to suppress all evidence seized during a search of Defendant's residence at the time of his arrest. Defendant contends that the search was illegal because the officers lacked either a search warrant, probable cause, or consent to search. [Doc. 36, at p. 6].

The government responds that Defendant's statements were unsolicited and not the result of interrogation in violation of Miranda. [Doc. 37, at p. 14-16]. The government also submits that any statements Defendant made were voluntary and not coerced in any way in violation of the Fifth Amendment. Id. As for the search, the government submits that the officers were given consent to enter the premises to look for Defendant and thereafter they obtained written consent to search the residence before searching and seizing certain items of contraband and evidence they found there. Id. at 7-14.

### III.
### Factual Background

As a result of an anonymous tip, Homeland Security Investigations ("HSI") opened an investigation of Defendant based upon information from the tip that he was using a fake Puerto Rican identity by the name of Raymon Delgado, selling drugs illegally,

---

[2] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

2

illegally possessing a gun, and committing marriage fraud. [T. 7][3]. The investigation led ultimately to the issuance of a state warrant for the arrest of Defendant for forgery. [T. 11, 50]. Based upon information developed as to Defendant's probable residence address, and after surveillance of this address, officers converged on 7082 Queens Ferry Drive, Mableton, Georgia, in an effort to locate Defendant and arrest him under the warrant. [T. 12].

Officer Shawn Owens with HSI testified that on the day of the arrest, August 28, 2012, he approached a woman who had come out of the subject residence at around seven o'clock in the morning to put children on the school bus. He identified himself and asked her if Defendant Alfredo Soto lived there. [T. 13]. She answered, "No." He then asked her if they, the officers, could go inside and look for him. [T. 13, 36-37].[4] The woman replied, "Sure," "Fine", or "Okay", and gestured that they could come in. [T. 14, 37, 83, 93]. The officers then followed her inside, down a hallway and into a bedroom, where they found Defendant hiding in the bathroom shower stall. [T. 14-15]. He was placed under arrest and handcuffed. [T. 39]. He admitted he was Alfred Soto-Garcia. [T. 38]. He was asked

---

[3] References to the transcript of the evidentiary hearing, [Doc. 35], will be indicated as follows: [T. "Page"].

[4] The officers came to the house with the intent to ask for and obtain consent to enter the house, if they could not arrest Defendant outside the house. [T. 34-35].

3

if he had any dangerous weapons, and he told the agents there was a pistol in the top of a closet in a bedroom. [T. 15-16, 39].

Defendant was then taken to the kitchen and sat down at the kitchen table. At some point not precisely identified he admitted to illegally using the name "Ramon Rivera Delgado" [T. 16]. After he was seated, he was first asked to consent to a search of the house and presented with a written consent, which he signed. [T. 18]. The officers also requested and obtained written consent from the woman who had been outside the house, identified as Ms. Arely Duarte, who also resided there. [T. 17-18]. Then, after the consent to search form was signed, the agents read Defendant his <u>Miranda</u> rights [T. 17, 19-20], and Defendant invoked his right to remain silent. [T. 17]. The officers did not question him after he invoked his rights. [T. 22].

After the consent was signed, the officers began the search. [T. 21]. During the search the officers found identification documents supporting the use of the false identity of Ramon Delgado by Defendant Soto. [T. 23]. Also during the search, after the agents seized the pistol that was found in the closet, one of the agents stated to another agent in Defendant's presence that they would need to run the serial number of the gun to see if it was stolen. Defendant then volunteered the statement that the weapon was not

4

stolen, that it was "clean," as he had used "Ramon's" identification to purchase it. [T. 22].

The agents also found approximately $37,000 in cash, which they ultimately left at the apartment and did not seize. [T. 24-25]. While the search was going on, Ms. Duarte was allowed to leave the apartment. [T. 25]. She was never arrested or detained [T. 44]. At around nine o'clock in the morning, about two hours after initial entry, the officers left the apartment and took Defendant to Cobb County to jail. [T. 28]

**IV.**
**Discussion and Analysis**

### A. Defendant's Statements

It is not disputed that Defendant's status in this case was "custodial," once he was arrested in the bathroom, handcuffed, and seated at the kitchen table. The government does not argue otherwise, and, indeed, the officers soon thereafter administered the Miranda advice of rights to Defendant, who invoked his right to remain silent and not be interrogated. Accordingly, the issue to be determined with regard to the statements Defendant made after he was advised of his rights is whether or not he was "interrogated" within the meaning of Miranda. In that regard, as the Court said in Miranda, "by custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into

5

custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444 (emphasis added).  In this case, according to the testimony of the agents, they did not expressly question Defendant after he invoked his rights.

Interrogation is not, however, limited simply to express questioning:

> Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)

But, on the other hand, as further explained by the Supreme Court in the same case:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.  The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . .  Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

Innis, 446 U.S. at 299-300 (quoting Miranda, 384 U.S. at 478); see Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991); United States v. Suggs, 755 F.2d 1538, 1541 (11th Cir. 1985); United States v.

6

Satterfield, 743 F.2d 827, 849 (11th Cir. 1984); Sullivan v. Alabama, 666 F.2d 478, 482 (11th Cir. 1982); see also United States v. Sanders, 315 F. App'x 819, 824 (11th Cir. 2009).

In this case, the officers testified that Defendant was read his Miranda rights and invoked them. The government witnesses also testified that Defendant was not asked any questions after he invoked his rights. While Defendant did make certain statements while the search was going on, the government witnesses characterized these statements as spontaneous, volunteered statements not made in response to questioning. I likewise find that the statements were volunteered. There is simply no credible testimony sufficient to support a finding that Defendant was questioned in violation of his Miranda right to remain silent after he invoked, or that the statements and utterances Defendant did make while he was seated at the table during the search were not spontaneous, voluntary utterances.

Nor were Defendant's statements elicited by the functional equivalent of questioning. The mere statement by one officer to another in Defendant's presence that the serial number on the gun would have to be run does not amount to the functional equivalent of questioning of Defendant designed to elicit an incriminating response. Similarly, Defendant volunteered statements about some of the identity documents that had been found, as they were brought to

7

the kitchen by the searching agents, but there is no evidence that these statements were made in response to questioning or its functional equivalent. Defendant has cited no cases in which scenarios such as were presented here were found to rise to the functional equivalent of interrogation.[5] Under these circumstances, the motion to suppress statements made on this ground should be **DENIED**.

On the other hand, it does appear that Defendant was questioned when he was arrested in the bathroom about whether there were any weapons in the house that could hurt the agents that the agents should be worried about. [T. 15, 39]. Defendant answered this question without benefit of Miranda warnings and told the agents about the whereabouts of the gun. The government has not provided any argument supporting the admissibility of this un-Mirandized statement and, in the absence of any authority cited in opposition, this statement should be suppressed.

---

[5] Brewer v. Williams, 430 U.S. 387 (1977), the only case cited by Defendant, is clearly distinguishable. In that case, Defendant had invoked his right to counsel under the Sixth Amendment. The officers there were found to have sought deliberately to elicit incriminating remarks from Defendant by stating to him that they felt they should stop and locate the body of the murdered girl so she could have a Christian burial, knowing Defendant was deeply religious. 430 U.S. at 392-93, 399. Here the agents were not speaking to Defendant, and the statements attributed to them are in no way similar to the statements made in Brewer, which were deliberately designed to elicit a response from the defendant. See United States v. Sanders, 315 F. App'x at 824 (11th Cir. 2009).

**B. Consent**

1. <u>In general</u>

Law enforcement officers, without a warrant, may conduct a search based upon an individual's voluntary consent, and evidence discovered and seized during such a search may be admitted at trial. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973). Consent may be express or implied but need not necessarily be knowing and intelligent. <u>Id.</u> at 241, 93 S. Ct. at 2055.[6] In order for consent to be deemed voluntary, it "must be the product of an essentially free and unconstrained choice." <u>United States v. Zapata</u>, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989)). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." <u>Florida v. Royer</u>, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983); <u>accord</u> <u>Schneckloth</u>, 412 U.S. at 233-34, 93 S. Ct. at 2051; <u>Zapata</u>, 180 F.3d at 1241; <u>United States v. Edmondson</u>, 791 F.2d 1512, 1515 (11th Cir. 1986).

---

[6] Knowledge of the right to refuse consent, however, is one factor to consider in evaluating voluntariness. <u>Schneckloth</u>, 412 U.S. at 227, 93 S. Ct. at 2047.

9

Whether or not voluntary consent has been given is a question of fact determined by examining the totality of the circumstances. Schneckloth, 412 U.S. at 226-27, 93 S. Ct. at 2047-48; United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996), overruled on other grounds by Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710 (2009); Tukes v. Dugger, 911 F.2d 508, 517-18 (11th Cir. 1990). Various factors may be considered in determining whether consent is voluntary, including: (1) an individual's knowledge of the right to refuse consent; (2) his or her youth, intelligence, lack of education, and language ability; (3) the degree to which the defendant cooperates with the police; (4) the defendant's attitude about the likelihood of discovery of illegal substances; and (5) the length of detention and the nature in which the defendant is questioned, including physical punishment or other coercive police behavior. Schneckloth, 412 U.S. at 226, 93 S. Ct. at 2047; United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001); United States v. Butler, 102 F.3d 1191, 1197 (11th Cir. 1997).

2. Consent to Entry

Defendant contends that Ms. Duarte did not voluntarily consent to the entry of the agents into the residence in this case. Defendant relies upon Ms. Duarte's testimony that she did not give them permission to come inside. [T. 113]. On the other hand, Agents Owens, Boyd, and Clark all testified that Ms. Duarte told them that

10

they could come inside, either by answering "Sure," "Fine," or "Okay," and/or by gesturing to the agents that they could come in. [T. 14, 37, 75, 83, 93]. I find the latter testimony by the agents to be more credible than Ms. Duarte's contrary testimony. In addition to being impeached by her self-interest in assisting Defendant, the father and supporter of two of her children, Ms. Duarte's testimony was not entirely inconsistent with what Agent Clark, at least, took to be her invitation for them to come in. [T. 113]. But, in any event, I accept the testimony of the agents that Ms. Duarte consented to their entry. There is no evidence that this consent was not voluntary.

   3. <u>Consent to Search</u>

Likewise, I find based upon the totality of the circumstances that Ms. Duarte voluntarily consented to the search of the premises that was conducted after the officers entered and made the arrest of Defendant. When she was presented with the consent form, Ms. Duarte was not detained, was not under arrest, was not restrained in any way. She was in her own home, amidst familiar surroundings. There is no evidence she was threatened or coerced to sign. The consent form that she signed acknowledged that she had been informed of her right to refuse to consent to a search without a warrant. <u>See</u> Gov't. Exh. 2. Agent Owens testified that he explained the form to Ms Duarte before she signed it. [T. 18]. Agent Boyd also testified that

11

the consent form was read to both Ms. Duarte and Defendant. [T. 76-77].

The only contrary evidence came from Ms. Duarte, who testified that she did not sign the consent until after the officers had searched, despite the fact that she admitted that she left the premises before the search was completed. [T. 116, 123]. She also claimed that she was not given a choice, and that she thought she was consenting only for the agents to take the gun. [T. 116]. She said she would not have signed if she had known she was giving permission to search the house. [T. 117]. I do not find this testimony sufficiently credible to overcome the testimony of the agents that they read and explained the consent form to Ms. Duarte and that she signed it thereafter, without any coercion by them. Accordingly, I conclude that Ms. Duarte voluntarily signed the consent to search.  The motion to suppress evidence from the search of the residence should be **DENIED** on this ground as well.

As for the consent to search signed by Defendant, his circumstances were somewhat different, but I nonetheless find his consent to have been valid.  He was under arrest and handcuffed at the time he gave consent, factors to be considered.  The officers had not yet advised him of his rights under Miranda when he was asked to sign the consent.  Nevertheless, he was not threatened; no guns were drawn; he was in familiar surroundings at his home when he

signed; he was cooperative; he had not been detained for long when the form was presented; the officers read the form to him and explained it to him; the form itself stated that he had the right to refuse to consent. Considering the totality of these circumstances, I conclude that Defendant's consent to search of the residence was voluntary. The motion to suppress based upon this ground should also be **DENIED**.

## V.
## Conclusion

For the reasons stated above, I conclude that Defendant was not interrogated after administration of his Miranda warnings and that any statements he made after his invocation of his right to remain silent were voluntary and admissible. The motion to suppress statements made after Miranda should, therefore, be denied. As for statements made in response to questioning by law enforcement after Defendant was arrested in the shower stall, but before he was advised of his rights, the motion to suppress should be granted. With regard to the motion to suppress evidence from the search of the residence, I find that Ms. Duarte voluntarily consented to the entry of the officers and to the search of the premises. Defendant also voluntarily consented to the search. In summary, the motion to suppress statements, [Doc. 13], should be **DENIED in part** and **GRANTED in part**. The motion to suppress evidence [Doc. 14]should be **DENIED**.

13

In addition, it appearing that there are no further pretrial or discovery matters to bring before the undersigned, it is therefore **ORDERED** that this case be and is hereby **CERTIFIED** as ready for trial.

**SO REPORTED AND RECOMMENDED**, this 5th day of September, 2013.

*S/ E. Clayton Scofield III*
E. Clayton Scofield III
**UNITED STATES MAGISTRATE JUDGE**